Guy Ruttenberg, Bar No. 207937
guy@ruttenbergiplaw.com
RUTTENBERG IP LAW,
A PROFESSIONAL CORPORATION
1801 Century Park East, Suite 1920
Los Angeles, CA 90067
Telephone: (310) 627-2270
Facsimile: (310) 627-2260

*Attorney for Plaintiffs,
Genius Sports, Ltd.*

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| GENIUS SPORTS LTD., | Case No. |
| Petitioner, | **DECLARATION OF MACGREGOR MOONEY IN SUPPORT OF GENIUS'S MOTION TO COMPEL META'S COMPLIANCE WITH SUBPOENA** |
| v. | |
| META PLATFORMS, INC., | |
| Respondent. | |

DECLARATION OF MACGREGOR MOONEY

I, MacGregor Mooney, declare as follows:

1. I am an attorney licensed to practice in the State of California and before this Court. I am an attorney at the law firm of Ruttenberg IP Law, A Professional Corporation, attorneys for Genius Sports, Ltd. ("Genius"). If called as a witness, I could and would testify competently as to the facts set forth below, as I know each to be true based upon my own personal knowledge or upon my review of the files and records maintained by Ruttenberg IP Law, A Professional Corporation, in the regular course of its representation of Genius. I submit this declaration in support of Genius' Motion to Compel Meta's Compliance with Subpoena.

2. On July 15, 2024, my firm (as counsel for Genius) served a subpoena on Meta Platforms, Inc. ("Meta") seeking documents related to Meta's "Facebook Live" product. Attached hereto as **Exhibit 1** is a true and correct copy of the July 14, 2024 subpoena served on Meta. After Genius granted Meta an extension to file its objections and responses, Meta served its objections to Genius' subpoena on August 19, 2024.

3. On August 5, 2024, Meta's counsel requested a meet and confer to better understand the scope of documents Genius was seeking in its subpoena.

4. On August 8, 2024, my firm held a teleconference with Meta's counsel, where we clarified (as specified in the subpoena) that Genius seeks documents related to Facebook Live, and we provided additional specifics.

5. On August 19, 2024, Meta served its objections to the subpoena. Attached hereto as **Exhibit 2** is a true and correct copy of Meta's August 19, 2024 objections.

6. On August 28, 2024, my firm conducted another meet and confer with Meta's counsel, where Meta confirmed it possesses confidential documents concerning Facebook Live's servers, subject to its objections.

1

DECLARATION OF MACGREGOR MOONEY

7. On September 4, 2024, we again requested that Meta produce the documents related to Facebook Live's servers.

8. Between September 4 and September 26, 2024, we followed up with Meta's counsel regarding the requested production. Counsel for Meta indicated it was awaiting client approval.

9. On September 26, 2024, Meta's counsel confirmed that Meta would produce the documents, but required additional protections beyond the scope of the then-governing Protective Order in the underlying Texas litigation. In particular, Meta noted that Paragraph 5 of the then-governing Protective Order permits disclosure of "Attorneys' Eyes Only" ("AEO") material to in-house counsel and designated party representatives. Meta requested that any AEO material it produces be limited to the individuals listed in Paragraphs 5(a)–(b) and 5(e)–(g) of the Protective Order.

10. On October 2, 2024, my firm contacted counsel for Plaintiff SportsCastr, Inc. d/b/a PANDA Interactive ("PANDA") in the underlying litigation to determine whether PANDA would consent to a supplemental Protective Order incorporating Meta's proposed restrictions. At that point, PANDA confirmed it did not object.

11. On October 14, 2024, my firm sent Meta a draft supplemental Protective Order addressing Meta's concerns, including limitations on disclosure to in-house counsel and corporate representatives.

12. On October 21, 2024, Meta's counsel requested a call to discuss the draft supplemental Protective Order.

13. On October 22, 2024, we held a further meet and confer with Meta's counsel, where Meta sought further protections. In addition to its prior requests, Meta asked that the parties be required to provide advance notice if any Meta confidential materials were to be used in public settings such as hearings, depositions, or trial. Meta also requested a provision that would prevent the parties

from opposing any reasonable request to seal the courtroom during the presentation of any testimony, evidence or arguments related to Meta's confidential material.

14. On October 24, 2024, we sent Meta a revised draft of the supplemental Protective Order reflecting the October 22 discussions.

15. On October 31 and November 6, 2024, we followed up with Meta regarding its feedback on the revised draft.

16. On November 11, 2024, Meta's counsel sent us proposed edits to the supplemental Protective Order, which we reviewed internally and considered.

17. On December 4, 2024, we sent Meta an updated draft of the supplemental Protective Order.

18. We continued to follow up with Meta regarding its position on the updated draft, including on December 17, 2024, and again on January 7, 2025.

19. On January 13, 2025, Meta provided its latest proposed edits, which included: (i) increasing the required advance notice period from two to five business days; and (ii) adding a footnote stating that the supplemental Protective Order does not govern source code and that any request for source code would require further conferral with Meta.

20. On January 14, 2025, I confirmed that we agreed to Meta's latest edits. Meta then confirmed its consent to the filing of the supplemental Protective Order.

21. On January 29, 2025, I sent PANDA a draft of the unopposed motion for a supplemental Meta-specific protective order, along with the proposed supplemental protective order that Meta had agreed to. PANDA asserted that the provisions in the proposed supplement exceed the provisions to which PANDA had previously agreed.

22. Thus, after back-and-forth emails, we arranged a three-way discussion between ourselves, PANDA's counsel and Meta's counsel in order to sort through PANDA's objections and Meta's concerns. During that call on February 19, 2025, we listened to concerns raised by PANDA, and we proposed modifications to

Meta's draft based on PANDA's concerns. I then emailed a revised proposal to both PANDA and Meta reflecting the three-way discussion.

23. On February 27, 2025, PANDA confirmed that it would not agree to any additions to the supplemental protective Order beyond Meta's initial request—namely, limiting the disclosure of AEO material to individuals identified in paragraphs 5(a)–(b) and (e)–(g).

24. On March 3, 2025, my firm requested another meet and confer with Meta due to PANDA's opposition to any further modifications for the Protective Order.

25. On March 11, 2025, we conferred further with Meta. During the call, we outlined several possible paths forward, including having Meta pare back its request and/or having Meta move for a supplemental Protective Order in California. However, we were concerned that a supplemental Protective Order from the California court may restrict Genius' ability to produce Meta's documents to PANDA unless PANDA either agrees to the Order (which it refused to do) or unless this Court entered the supplemental Protective Order.

26. PANDA ultimately would not agree to a supplemental protective order that went beyond the scope of (i.e. Meta's request that AEO material it produces be limited to the individuals listed in Paragraphs 5(a)–(b) and 5(e)–(g) of the Protective Order). At Meta's request, Genius brought a motion for a Meta-specific Supplemental Protective Order in the Texas Court.

27. Between April 11 and April 24, 2025, my firm held multiple subsequent meet and confer discussions with Meta regarding Genius's anticipated motion for a supplemental Protective Order.

28. On April 25, 2024, Genius brought a motion for a supplemental protective order in the Eastern District of Texas.

29. On June 27, 2025, the Court granted Genius' motion. Attached hereto as **Exhibit 3** is a true and correct copy of the Court's Order.

4
DECLARATION OF MACGREGOR MOONEY

30. On July 3, 2025, Meta produced a total of eight documents totaling fourteen pages. It appeared that Meta had not conducted a reasonable search for responsive documents.

31. Given the small volume of documents produced, I followed up with Meta for a supplemental production.

32. On July 10, 2025, we had a meet and confer with Meta's counsel in which we requested supplemental documentation. As an alternative, Meta's counsel suggested Meta could retrieve and produce archived documents produced in a prior case, although Meta's counsel could not identify the specific case at that time.

33. After another meet and confer call on July 25, 2025, Meta's counsel confirmed that the prior case was *Voxer, Inc. et al. v. Facebook, Inc.* et al., No. 1:2020cv00655. Meta's counsel offered to produce all relevant documents from the *Voxer* production, subject to third-party confidentiality, but insisted that Genius cover the costs associated with the production, without providing details on the scope or estimated cost of the production.

34. On July 29, 2025, I followed up with Meta's counsel on another meet-and-confer call, requesting further clarification on the anticipated costs and scope of the *Voxer* production. Meta's counsel was unable to provide answers but promised to follow up with their client contact, who was apparently out of the office at that moment.

35. On August 1, 2025, Genius confirmed its willingness to accept the *Voxer* production and offered alternative ways to ease any burden on Meta: Meta could produce documents cited in its own expert's report. Meta's counsel indicated that their client contact was still unavailable, but promised to provide an update once they were available.

36. On August 4, 2025, we again offered to narrow the scope of the requested production to documents contained in Meta's infringement (or non-infringement) reports from the *Voxer* case, in an effort to ease the burden on Meta.

5
DECLARATION OF MACGREGOR MOONEY

37. On August 7, 2025, we checked in on the status. Meta's counsel informed us that they would have an update when they heard back from their client contact.

38. On August 8, 2025, Meta's counsel informed us that they were mistaken about the timing of their client contact's return. Apparently, the client contact with knowledge of the *Voxer* production would not return until the following week (i.e. the week of August 11) but could not give a specific date of return.

39. On August 14, 2025, Meta's counsel relayed that a "data issue" with the expert reports in the *Voxer* case had prevented Meta from pulling documents directly from the expert reports. As an alternative, Meta suggested that Genius provide search terms to help narrow the search for responsive documents in the *Voxer* production, but insisted that Genius bear the cost of the review and production. Genius agreed to provide search terms but emphasized the need for a reasonable estimate of costs and suggested a follow-up call for August 15, 2025. Genius also requested Meta provide an estimation of cost the following day.

40. On August 15, 2025, I held a further discussion with Meta's counsel. I confirmed we had a narrow set of search terms, but Meta could not provide an estimate of production costs. Meta's counsel indicated they were prepared to review the documents immediately once Genius provided the search terms. Genius reiterated its inability to agree to cover the costs without knowing the specifics of the production process and cost estimate. I requested a cost estimation by the following Monday morning (August 18). Following the call, I sent Meta's counsel a list of search terms.

41. On August 18, 2025, Meta provided a list of hits based on the search terms Genius provided. The hits totaled over 100,000 documents. Meta insisted that it could not provide a cost estimate for such a high number of documents. Therefore, Genius narrowed the search terms and sent a list to Meta.

6
DECLARATION OF MACGREGOR MOONEY

42. On August 19, 2025, Meta responded that the hit count was still too high and approximately 27,000 documents. Again, Meta could not provide a cost estimate to review. Genius therefore provided an even narrower subset of search terms.

43. On August 20, 2025, Meta responded that six of the search terms provided by Genius yielded approximately 2,000 hits. Meta provided an estimated cost of $15,000 to $60,000 to review. Meta's counsel insisted it would be near impossible to have the production complete by the August 22, 2025 discovery cutoff. Therefore, Genius provide a further narrowed search term list.

44. On August 21, 2025, Meta responded that the total search terms yielded 1,312 hits. Despite this reduction, Meta's counsel re-iterated its prior price quote. In response, Genius offered to limit the search to documents before August 5, 2016.

45. Meta responded that the number of hits was approximately 1,000 documents and gave an estimate of $10,000 to $20,000. Meta's counsel confirmed they would not be able to complete the production until the following week (i.e. after the August 22, 2025) discovery cutoff.

46. On the morning of August 22, 2025, I sent Meta's counsel yet another narrowed search term list. Meta's counsel relayed they had yet to input the search terms to determine the yield of hits. Meta's counsel also confirmed that it would still not be able to produce documents by the end of the day (August 22, 2025). I therefore informed Meta's counsel that Genius would move to compel production in order to preserve Genius' rights.

I declare under penalty of perjury that the foregoing is true and correct. Executed this day, August 22, 2025.

By:     */s/ MacGregor Mooney*
           MacGregor Mooney

7

DECLARATION OF MACGREGOR MOONEY